

**NUMBER 13-06-00561-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **WESLEY CHARLES JOSEPH,** | **Appellant,** |

**v.**

| | |
|---|---|
| **THE STATE OF TEXAS,** | **Appellee.** |

### On appeal from the 187th District Court
### of Bexar County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Vela
### Memorandum Opinion by Justice Garza

Appellant, Wesley Charles Joseph, was convicted of murder and sentenced to twenty-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2003). He now challenges his conviction, contending that: (1) he was arrested without a warrant, probable cause, or other lawful authority; (2) he did not make a knowing, intelligent, and voluntary waiver of his right against self-incrimination; (3) the trial court erred in admitting into evidence the entirety of his recorded interview with police; and (4) the trial court erred in failing to require in the jury charge a unanimous verdict on a specific offense. We affirm.

## I. BACKGROUND

On December 6, 2004, San Antonio Police Department officer James Flores was dispatched to the San Antonio Metropolitan Ministries ("SAMM") homeless shelter in downtown San Antonio, to respond to a reported "cutting" or stabbing. The victim was Javier Gonzalez-Diaz, also known as "Bolillo" or "Chilungo." As Officer Flores approached the shelter, several homeless people gave descriptions of two suspects and information as to their location. Another officer, Richard Boyle, heard this information on his radio and went to the specified location, where he identified Joseph, who matched the given description—a black male wearing a dark hooded sweatshirt—and the other suspect, Juan Martinez. At that time, Officer Boyle observed a group of people surrounding Joseph and pointing at him, saying "that's him, that's him, that's the guy." Officer Boyle and another officer commanded Joseph to get down on the ground, but Joseph did not immediately comply. After a brief struggle, the officers forced Joseph to the ground, handcuffed him and conducted a search, which revealed a blood-stained 7.5-inch single-edge knife in Joseph's front sweatshirt pocket. Two other knives were found in a backpack being worn by Martinez.

Joseph was detained and brought to the San Antonio Police Department, where he was interviewed by Detective Sean Walsh. The entire interview, lasting approximately five to six hours, was recorded on video and transcribed. During the interview, Joseph commented that "I wish I hadn't put the knives in his backpack," as well as "I don't want to die in the penitentiary." According to Detective Walsh, Joseph was inconsistent in his recounting of the events of that day, calling one such recollection his "official story." Further, Joseph apparently admitted to the crime in stating that he had done a "stab-by." At no time during the interview did Joseph blame Martinez for the stabbing.

At the same time Joseph was being interviewed by Detective Walsh, Martinez was being interviewed by Detective Curtis Walker. Martinez's interview revealed that he had

2

a potential motive for harming Gonzalez-Diaz; namely, Martinez believed that Gonzalez-Diaz had attacked and raped his wife, Vivian, who was also Joseph's girlfriend. Joseph concedes that he and Martinez "had the same motive for hurting" Gonzalez-Diaz. In fact, Vivian came to the police station during Joseph's interrogation out of concern for Joseph.

On June 29, 2005, a Bexar County grand jury indicted Joseph on one count of murder.[1] The indictment also included an enhancement paragraph alleging that Joseph had been twice previously convicted of burglary of a building in Victoria County, once in 1987 and once in 1992. *See id.* § 30.02 (Vernon 2003).

A trial was conducted before a Bexar County jury from June 21 to 25, 2006. At trial, the State presented testimony from Officers Flores and Boyle, as well as crime scene technician Joe Rodriguez. Rodriguez testified that he collected three knives from the crime scene, as well as clothing found at the scene; he also testified that Joseph had no wounds, no blood on his hands, and no apparent blood on his clothing at the time of his arrest.

Also testifying for the State was Garon Foster of the Bexar County Criminal Investigation Laboratory, who analyzed the knife recovered from Joseph's pocket. Foster testified that the blood on the knife matched the genetic profile of the victim, Gonzalez-Diaz.

Carlos Ortiz, a friend of Gonzalez-Diaz, testified that he witnessed the stabbing.

---

[1] The single count with which Joseph was charged was presented in two paragraphs, tracking the provisions of section 19.02(b) of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (b)(2) (Vernon 2003). Specifically, the indictment alleged as follows:

Paragraph A
on or about the 6th Day of December, 2004, WESLEY CHARLES JOSEPH, did intentionally and knowingly cause the death of an individual, namely: Javier Gonzalez-Diaz, by CUTTING AND STABBING JAVIER GONZALEZ-DIAZ WITH A DEADLY WEAPON, NAMELY: A KNIFE, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY;

Paragraph B
And on or about the 6th Day of December, 2004, WESLEY CHARLES JOSEPH, with intent to cause serious bodily injury to an individual, namely: Javier Gonzalez-Diaz, did commit an act clearly dangerous to human life that caused the death of Javier Gonzalez-Diaz, by CUTTING AND STABBING JAVIER GONZALEZ-DIAZ WITH A DEADLY WEAPON, NAMELY: A KNIFE, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY.

Ortiz saw Joseph "punch" Gonzalez-Diaz in the stomach five or six times, and he then observed Joseph putting something under the sweater he was wearing. Ortiz testified that he went over to his friend, who was bleeding; he then followed Joseph away from the scene and pointed him out to police officers. Ortiz also observed a woman present at the crime scene but could not identify her.

Dr. Kimberly Molina of the Bexar County Medical Examiner's Office testified that Gonzalez-Diaz had been stabbed three times in the chest region and also suffered some small scratches and bruises, and that he died as a result of the stab wounds.

During Detective Walsh's testimony, the State sought to introduce into evidence the video recording of Joseph's interview, including the alleged confession. The trial court then held a *Jackson v. Denno* hearing outside the presence of the jury to determine the admissibility of the recorded material.[2] *See Jackson v. Denno*, 378 U.S. 368, 380 (1964); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005). During that hearing, Detective Walsh testified that he had informed Joseph of his right to remain silent. Detective Walsh also stated that Joseph had signed a card advising him of his rights, expressed that he understood his rights, and did not ask for an attorney or for the interview to cease. The trial court found that the DVD recording of Joseph's statement would be admissible, provided that the State redact portions that were inadmissible or irrelevant, such as declaratory statements made by the police officers and questions asked by the officers which Joseph did not answer affirmatively.[3]

Joseph testified in his own defense. He stated that he knew Martinez as a friend but acknowledged that he had had sex with Martinez's wife, Vivian. According to Joseph,

---

[2] In a *Jackson v. Denno* hearing, the trial judge determines the admissibility of a confession based on whether or not the confession was voluntarily given, but does not consider whether the statement given by appellant was truthful or untruthful. *Martinez v. State*, 127 S.W.3d 792, 797 (Tex. Crim. App. 2004); *see Jackson v. Denno*, 378 U.S. 368, 380 (1964).

[3] As required by the Texas Code of Criminal Procedure, the trial court filed findings of fact and conclusions of law with regard to its ruling that Joseph's recorded statement was admissible. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005).

4

Martinez telephoned him on December 5, 2004, to inform him of Vivian's report that she had been attacked and raped by Gonzalez-Diaz. Joseph knew Gonzalez-Diaz, as they had both stayed at the SAMM shelter previously. Joseph testified that he accompanied Martinez to the shelter to confront Gonzalez-Diaz, and that he took his backpack with him which contained two knives he used for cooking at his job at a rest stop on Interstate 10. Joseph stated that Martinez took the backpack from him when Joseph went into a store near the shelter to buy beer. He further stated that Martinez intended to beat up Gonzalez-Diaz, not to stab him, and that Joseph was to get involved only if Martinez needed protection.

Joseph testified that he observed Martinez "punching" Gonzalez-Diaz, but that he did not see a stabbing. He then approached the two men in case Martinez needed help, explaining as follows:

> [The fight] continues. I walk across the street. I come up on the sidewalk and I saw the knife, and I hit him. I hit him [Martinez] on the arm and the knife fell down, and I said, "Man, are you stupid. You said kick his ass, not kill him. What are you doing." And I grabbed him and I pushed him. I looked down at the knife. Chilungo is still standing there, I looked down at the knife, I didn't see no blood, so I say, okay, he didn't do nothing. I picked it up and put it in my front pouch, because, you know, he's standing there, you know, he's not on the ground, he's not – I don't see no blood on him either . . . so, I'm not going to leave the knife there. Juan, this is my partner. He's punching this dude. Okay? Knife is on the ground. So, if I turn around with the knife on the ground, he'd pick the knife up and he'd stab me or Juan; so, I'm not going to leave the knife on the ground. And plus, it's my knife.

Joseph testified that he and Martinez then walked away from the scene and that he was arrested five to seven minutes later. He explained that he did not get on the ground immediately when asked by the police because another officer was telling him not to move. Further, he explained that his subsequent comments to Detective Walsh at the police station about his "official story" and about doing a "stab-by" were merely jokes. Joseph testified that he did not originally blame Martinez for the stabbing because he wanted to protect Martinez and Vivian, whom he believed Martinez would protect.

The jury unanimously found Joseph guilty as charged in the indictment, found the

enhancement allegations in the indictment to be true, and assessed Joseph's punishment at twenty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. This appeal ensued.

## II. Discussion

### A. Warrantless Arrest

By his first issue, Joseph claims that all evidence obtained as a result of his arrest, including the knife found in Joseph's sweatshirt pocket and his recorded interview with police, should have been suppressed because his warrantless arrest violated the Fourth Amendment to the United States Constitution. *See* U.S. Const. amend. IV; Tex. Code Crim. Proc. art. 38.23 (Vernon 2005).[4] We disagree.

### 1. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give "almost total deference" to the trial court's findings of historical fact supported by the record, but we review its application of the law to the facts under a de novo standard of review. *Id.* at 327; *see Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In a motion to suppress hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *See State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). Accordingly, the trial court may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). This is so because it is the trial court that observes first hand the demeanor and appearance of a witness, as opposed to an

---

[4] Article 38.23(a) of the Texas Code of Criminal Procedure provides, in relevant part:

No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex. Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).

6

appellate court which can only read an impersonal record. *Id.* If the trial court's decision is correct on any theory of law applicable to the case, the decision will be sustained. *Ross*, 32 S.W.3d at 855-56.

**2. Applicable Law**

Warrantless arrests are authorized only if (1) there is probable cause, and (2) the arrest falls within one of the limited circumstances provided by statute. *See Lunde v. State*, 736 S.W.2d 665, 666 (Tex. Crim. App. 1997); *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991) (en banc). Probable cause exists where the police have relatively trustworthy information, considered as a whole, sufficient to warrant a reasonable person to believe a particular person has committed or is committing an offense. *Hughes v. State*, 24 S.W.3d 833, 838 (Tex. Crim. App. 2000).

The limited circumstances under which warrantless arrests are permitted are enumerated in chapter fourteen of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. arts. 14.01-.06 (Vernon Supp. 2007). Such circumstances include when "persons [are] found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony . . . or threaten, or are about to commit some offense against the laws." *Id.* art. 14.03(a)(1). Moreover, "[w]here it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused." *Id.* art. 14.04.

**3. Analysis**

Joseph was arrested several blocks away from the SAMM shelter by Officer Boyle. In carrying out the arrest, Officer Boyle was operating with two primary pieces of information: (1) a statement made by Officer Flores via radio indicating that there had been a "stabbing or cutting at 910 West Commerce at the SAMM Shelter," and including a

7

description of a black male wearing dark clothing and a hooded sweatshirt; and (2) the statements of several bystanders pointing at Joseph and yelling "that's the guy."

Joseph notes that, although Officer Boyle received the call about a stabbing from a fellow officer whom he believed to be a reliable source, the information relayed to him actually emanated from another group, "presumably of homeless and transient persons." Joseph contends that, because "nothing is known from the record" about this group of informants, that the State "made no showing that the underlying report was known to be reliable at the time of the arrest." In actuality, Officer Flores testified that he was familiar with the individuals at the shelter who provided him with the information about the stabbing and the description of the subject. Viewing the evidence in the light most favorable to the trial court's ruling, we find that the police had relatively trustworthy information, considered as a whole, sufficient to warrant a reasonable person to believe that Joseph was the perpetrator of the stabbing. *See Hughes,* 24 S.W.3d at 838.

The State contends that, with this probable cause, Joseph's warrantless arrest was authorized under two statutory exceptions provided in the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. arts. 14.03(a)(1), 14.04. First, the State argues that the police were authorized to arrest Joseph without a warrant because Joseph was found in a suspicious place and under circumstances which reasonably show that he committed a felony. *See id.* art. 14.03(a)(1). The determination of whether a place is "suspicious" is a highly fact-specific analysis. *Dyar v. State*, 125 S.W.3d 460, 468 (Tex. Crim. App. 2003). Any "place" may become suspicious when a person at that location and the accompanying circumstances raise a reasonable belief that a person has committed a crime and exigent circumstances call for immediate action or detention by the police. *Gallups v. State*, 151 S.W.3d 196, 202 (Tex. Crim. App. 2004) (citing *Dyar*, 125 S.W.3d at 468-71). Though several different factors have been used to justify the determination of a place as suspicious, the Texas Court of Criminal Appeals has noted that the time between the crime

8

and the apprehension of the suspect in a suspicious place is an important factor. *Dyar*, 125 S.W.3d at 468.

Here, Officer Flores was informed by witnesses that a man meeting Joseph's description had stabbed Gonzalez-Diaz. Several witnesses followed Joseph from the scene of the crime and pointed him out to Officer Boyle. Although the intersection of Houston Street and Main Street, where Joseph was arrested, is not a suspicious place per se, Joseph's close proximity to the crime scene, in terms of both time and location, rendered it suspicious for purposes of effectuating Joseph's arrest. We therefore conclude that Joseph's warrantless arrest was authorized under article 14.03(a)(1) of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art 14.03(a)(1).

The State also argues that Joseph's arrest was authorized under article 14.04 of the code of criminal procedure because Joseph was attempting to escape from a felony arrest. *See id.* art. 14.04. Officer Boyle testified that, when he and another officer ordered Joseph to get on the ground, he did not do so immediately. Officer Boyle also stated that while Joseph did not attempt to flee at this point, he "was looking more at the avenue of escape, startled." Joseph notes correctly that there must be some act by the suspect evincing an intention to escape in order to effectuate an arrest under article 14.04, and that "satisfactory proof of escape is not established by the mere fact that a suspect travels from one place to another." *Dowthitt v. State*, 931 S.W.2d 244, 259 (Tex. Crim. App. 1996). However, Officer Boyle's testimony established more than Joseph's mere traveling from one place to another; it established that Joseph failed to comply with the officers' initial demands, that he "look[ed] . . . at the avenue of escape," and that he engaged the officers in a brief struggle before allowing himself to be handcuffed.[5] Giving "almost total deference" to the trial court's findings of historical fact supported by the record, *see Carmouche*, 10 S.W.3d

---

[5] Factors such as furtive movements and gestures, the place where a suspect is found and the direction in which he is traveling are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of the crime, are properly considered in the decision to make an arrest. *See Pyles v. State*, 755 S.W.2d 98, 109 (Tex. Crim. App. 1988).

at 327, we find that Joseph's arrest was further justified under article 14.04 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 14.04.

We conclude that the police had probable cause to arrest Joseph, and that his warrantless arrest was authorized under the applicable statutory provisions. *See id.* arts. 14.03(a)(1), 14.04. As such, the trial court did not err in denying Joseph's motion to suppress evidence obtained incident to that arrest. Joseph's first issue is overruled.

## B. Waiver of *Miranda* Rights

By his second issue, Joseph contests the trial court's denial of his motion to suppress evidence of his recorded interview with police. Specifically, Joseph argues that the interview evidence should have been suppressed because he did not make a knowing, intelligent, and voluntary waiver of his rights under *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), and article 38.22 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005).

### 1. Standard of Review

As noted above, we review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving "almost total deference" to the trial court's findings of historical fact supported by the record, but reviewing de novo its application of the law to the facts. *See Carmouche*, 10 S.W.3d at 327; *Guzman*, 955 S.W.2d at 89.

### 2. Applicable Law

Statements arising from a custodial interrogation may not be used by the State unless procedural safeguards were in place to secure the accused's Fifth Amendment privilege against self-incrimination. *See* U.S. CONST. amend. V; *Miranda*, 384 U.S. at 444; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22. Any waiver of *Miranda* rights on behalf of an accused must be made knowingly, intelligently, and voluntarily. *See Miranda*, 384 U.S. at 475. Our inquiry into whether an accused has effectively waived his rights has two distinct dimensions: first, the relinquishment of the right must have been voluntary in the

10

sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* An express waiver is not necessary; waiver may be inferred from the actions and words of the person interrogated. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Rocha v. State*, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000). Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Moran*, 475 U.S. at 421; *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997).

### 3.    Analysis

The trial court conducted a *Jackson v. Denno* hearing to determine the admissibility of a digital recording of Joseph's interview with Detective Walsh. *See Jackson*, 378 U.S. at 380. Detective Walsh testified that, at the beginning of the interview, he established that Joseph read and spoke English, and he read Joseph his rights from a prepared card. The card stated as follows:

> WARNING TO ARRESTEE OR SUSPECT
>
> Before you are asked any questions, it is my duty as a police officer to advise you of your rights and to warn you of the consequences of waiving these rights.
>
> 1.  You have the right to remain silent.
>
> 2.  You do not have to make any statement oral or written, to anyone.
>
> 3.  Any statement that you make will be used in evidence against you in a court of law, or at your trial.
>
> 4.  You have a right to have a lawyer present to advise you before and during any questioning by police officers or attorneys representing the state.
>
> 5.  You may have your own lawyer present, or if you are unable to employ a lawyer, the court will appoint a lawyer for you free of charge, now, or at any other time.

11

6. If you decide to talk with anyone, you can, and you can stop talking to them at any time you want.

7. The above rights are continuing rights which can be urged by you at any stage of the proceedings.

DO YOU UNDERSTAND THESE RIGHTS?

At the request of Detective Walsh, Joseph dated, signed, and initialed the card. The interview proceeded, and at no time did Joseph request an attorney or request that the interview cease. There was no evidence of any intimidation, coercion, or deception on behalf of the interviewing detectives.

Joseph contends that the rights as set forth on the card do not exactly track the language of article 32.88, section 2(a) of the code of criminal procedure, but merely paraphrase them. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22.[6] We disagree. The rights as printed on the card and as read aloud by Detective Walsh to Joseph substantially track

---

[6] Section 2 of article 38.22 of the code of criminal procedure provides as follows:

No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time . . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (Vernon 2005). Section 3(a) of article 38.22, applicable here, further provides:

No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless . . . (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning . . . .

*Id.* art. 38.22, § 3(a) (Vernon 2005).

12

the warnings provided in the code of criminal procedure and were clearly sufficient to advise Joseph of his rights as required by the statute. *See id.*

Joseph argues that, even if he was properly advised of his rights, he never actually waived those rights. Joseph is correct in noting that the card he signed and initialed did not explicitly state that he had waived his rights; rather, it merely advised him of the substance of those rights. Joseph contends that "the mere presence of a signature and initials on the side of a rights card put there at the explicit request of an interrogating officer, do not demonstrate any kind of compliance with the requirement of [Texas Code of Criminal Procedure article 38.22] that a knowing, intelligent and voluntary waiver of rights be demonstrated." In support of his argument, Joseph cites *Garcia v. State*, 919 S.W.2d 370, 385-387 (Tex. Crim. App. 1996). In *Garcia*, the suspect initialed a statement of his rights fifteen times and acknowledged that he had been "duly warned and advised of his rights." *Id.* However, the statement did not explicitly state that the suspect had waived those rights. *Id.* The court of criminal appeals held that there had been a valid waiver of rights under the statute, but that the suspect's statement was "by no means a model of clarity" and that the case was "a close call." *Id.* at 387.

Here, as in *Garcia*, Joseph clearly understood his rights, but did not explicitly waive them. As the court of criminal appeals noted in *Garcia*:

> The clearly preferable practice is for a written statement, to meet unambiguously the requirements of [the code of criminal procedure], to contain the following language, near or adjacent to the signature of the individual giving the statement: "I knowingly, voluntarily and intelligently waived the rights described above before and during the making of this statement."

*Id.* Nevertheless, the fact that Joseph acknowledged his rights in writing, combined with the fact that Joseph voluntarily continued the interview after being advised of those rights, is strong evidence that he knowingly, voluntarily, and intelligently waived the protections afforded to him under article 38.22 of the code of criminal procedure.

Considering the totality of the circumstances surrounding the interrogation, *see*

13

*Moran*, 475 U.S. at 421, we conclude that Joseph did knowingly, intelligently, and voluntarily waive his privilege against self-incrimination, in compliance with article 38.22 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22. Therefore, the court did not err in denying his motion to suppress evidence of the recorded interview. Accordingly, Joseph's second issue is overruled.

## C. Admission of Interview Evidence

By his third issue, Joseph contends that the trial court erred by admitting into evidence the entirety of his recorded interview with police. Specifically, Joseph argues that the trial court should not have admitted the entire interview under the rule of optional completeness, because parts of the interview—such as declaratory statements made by police and questions posed by police but not answered by Joseph—were not necessary to make Joseph's statements fully understood by the jury. *See* TEX. R. EVID. 107.[7] However, the State claims, and we agree, that Joseph failed to preserve the issue for appeal. *See* TEX. R. APP. P. 33.1.

Joseph notes that the trial court conducted a pre-trial hearing on June 20, 2006, at which the recording of the interview had been discussed. At that hearing, the State presented a DVD recording of Joseph's interview with police. At that time, Joseph's counsel advised the trial court that he objected to the admission of certain statements made by the detectives during the interview. Specifically, Joseph's counsel asked that redactions be made to the DVD to remove questions by the detective which were not responded to by Joseph and those which were not answered affirmatively. The trial court agreed and

---

[7] Texas Rule of Evidence 107, entitled "Rule of Optional Completeness," provides:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is *necessary to make it fully understood* or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given. "Writing or recorded statement" includes depositions.

TEX. R. EVID. 107 (emphasis added).

14

instructed the State's attorney to redact from the recording all statements and questions made by the detectives which did not correspond to an affirmative response made by Joseph.

The State attempted to enter the redacted DVD into evidence at the conclusion of the *Jackson v. Denno* hearing. *See Jackson*, 378 U.S. at 380. At that point, the trial court indicated that it had concerns regarding statements remaining on the redacted DVD which were not admissible under article 38.22 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22. However, the State's attorney advised the trial court that Joseph's counsel had objected to parts of the DVD recording at the pre-trial hearing, and that the material he objected to had been redacted from the recording. Joseph's counsel informed the court that, while he did not fully analyze the six-hour DVD to determine whether all the material he objected to had been redacted, he "relied on [the State's] representation that they took all of that out, based on your ruling." The trial court still expressed concern that there would be some inadmissible statements remaining on the recording. Joseph's counsel sought to reassure the court, stating:

> Now, there's still going to be spots in here, a lot of spots where the detectives are talking and they're trying to get [Joseph] to talk. I didn't necessarily have an objection to the things they were saying or the manner in which they were trying to get him to talk. That's why I didn't object to it [at the pre-trial hearing].

Despite assurances from both the State and defense counsel that all of the inadmissible material had been redacted from the DVD, the trial court insisted that further redactions be made to ensure that only "very specific questions" answered affirmatively by Joseph be retained on the DVD recording.

On the following day of trial, the State introduced without objection its Exhibit Number 27(b), which consisted of nine short clips taken from the original interview. Joseph's counsel then cross-examined Detective Walsh regarding the interview. At the conclusion of the cross-examination, the State moved to introduce the entire redacted recording of the

15

interview, its Exhibit Number 29, claiming that "[defense counsel] has created a lot of questions about the DVD." A brief conference was held outside the presence of the jury, after which the trial court admitted Exhibit Number 29. Subsequently, Joseph's counsel objected, stating: "We object, Judge, for all the reasons we stated outside the presence of the jury."

When a complaint on appeal does not comport with the objection made at trial, nothing is preserved for our review. *See* TEX. R. APP. P. 33.1; *Routier v. State*, 112 S.W.3d 554, 586 (Tex. Crim. App. 2003). Moreover, a general or insufficiently specific objection does not preserve error for appeal. *Long v. State*, 800 S.W.2d 545, 548 (Tex. Crim. App. 1990). However, if the grounds for the objection are obvious to the court and opposing counsel, then error is preserved. *Id.*

Here, Joseph's counsel objected at the pre-trial hearing to the admission into evidence of certain statements made by the detectives on the DVD. In response, the prosecuting attorneys redacted declaratory statements made by police and questions posed by police that were not answered affirmatively by Joseph. When the State offered the entire redacted DVD into evidence, Joseph's counsel objected "for all the reasons we stated outside the presence of the jury." However, it is unclear from the record what those "reasons" are. There were three conferences outside the presence of the jury that Joseph's counsel could have been referring to: the pre-trial hearing, the *Jackson v. Denno* hearing, and the brief conference that took place when the State attempted to admit the entire redacted DVD. The only time that Joseph's counsel articulated legal grounds for an objection was at the pre-trial hearing, during which he raised concerns about certain statements not being admissible under article 38.22 of the code of criminal procedure. At the *Jackson v. Denno* hearing, Joseph's counsel did not object to the admittance of the redacted DVD; instead, it was the trial court that continued to raise concerns despite assurances from both the State and Joseph's counsel that all objectionable material had

16

been removed.  Finally, Joseph's counsel did not articulate any grounds for objection during the brief conference held outside the presence of the jury when the State attempted to admit the entire redacted DVD.  At no time did Joseph's counsel articulate any grounds for objecting to the admission of the DVD after he acknowledged that all appropriate redactions had been made.

We conclude that the grounds for Joseph's objection were insufficiently specific, and were not obvious to the court and opposing counsel.  *See Long*, 800 S.W.2d at 548.  Moreover, because Joseph's counsel made no mention at trial of the rule of optional completeness as a basis for objection, Joseph's complaint on appeal does not comport with any objection made at trial.  *See Routier*, 112 S.W.3d at 586.  Therefore, Joseph has not preserved the issue for our review.  *See* TEX. R. APP. P. 33.1.  Accordingly, we overrule his third issue.

### D.  Requirement of Unanimous Verdict

By his fourth issue, Joseph alleges that the trial court erred and caused him egregious harm by failing to require in the jury charge a unanimous verdict on a specific offense, contrary to article V, section 13 of the Texas Constitution.  *See* TEX. CONST. art. V, § 13.[8]  Joseph argues that, because the jury charge contained two different application paragraphs, "[t]here is no way to know of what precise offense or offenses the jury in this case actually convicted" Joseph.  We disagree.

The Texas Court of Criminal Appeals has stated that article V, section 13 of the Texas Constitution requires a unanimous jury verdict in all felony cases.  *Stuhler v. State*, 218 S.W.3d 706, 716 (Tex. Crim. App. 2007) (construing TEX. CONST. art. V, § 13).  It is error for the trial court to submit a jury charge that does not require unanimous agreement

---

[8] Article V, section 13 of the Texas Constitution provides, in relevant part, as follows:

Grand and petit juries in the District Courts shall be composed of twelve persons, except that petit juries in a criminal case below the grade of felony shall be composed of six persons; but nine members of a grand jury shall be a quorum to transact business and present bills.

TEX. CONST. art. V, § 13.

on one theory of the offense. *Ngo v. State*, 175 S.W.3d 738, 740 (Tex. Crim. App. 2005). Because no objection to the jury charge was made by Joseph at trial, we will only reverse if we find an error to have created such "egregious harm" that Joseph "has not had a fair and impartial trial." *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

In evaluating a unanimity challenge, we must examine the language of the statute in order to determine the elements of the crime and whether the legislature has created a single offense with multiple or alternate modes of commission. *See Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006). For example, where the legislature has specified that any of several different mental states will satisfy the intent or mens rea element of a particular crime, unanimity is not required on the specific alternate mental state as long as the jury unanimously agrees that the state has proven the intent element beyond a reasonable doubt. *Id.*

The relevant statutory provisions of the Texas Penal Code state that a person commits the offense of murder if he: (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (3) commits felony murder. TEX PENAL CODE ANN. § 19.02(b). The jury charge closely tracked the provisions of the statute.[9]

---

[9] The application paragraphs of the jury charge read specifically as follows:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 6th Day of December, 2004, in Bexar County, Texas, the defendant, Wesley Charles Joseph, did intentionally or knowingly cause the death of an individual, namely: Javier Gonzalez-Diaz AKA "Bolillo," by cutting or stabbing Javier Gonzalez-Diaz AKA "Bolillo" with a deadly weapon, namely: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury;

> Or, if you find from the evidence beyond a reasonable doubt that on or about the 6th Day of December, 2004, in Bexar County, Texas, the defendant, Wesley Charles Joseph, with intent to cause serious bodily injury to an individual, namely: Javier Gonzalez-Diaz AKA "Bolillo," did commit an act clearly dangerous to human life that caused the death of Javier Gonzalez-Diaz AKA "Bolillo", by cutting or stabbing Javier Gonzalez-Diaz AKA "Bolillo" with a deadly weapon, namely: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury, then you will find the defendant guilty of murder as charged in the indictment.

> If you do not so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

18

Here, the jury unanimously found that Joseph either: (1) intentionally or knowingly caused Gonzalez-Diaz's death; or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Gonzalez-Diaz's death. *See id.* § 19.02(b)(1), (b)(2).

Joseph relies on *Ngo*, 175 S.W.3d at 744-45, and *Francis v. State*, 36 S.W.3d 131 (Tex. Crim. App. 2000), two cases in which the courts found a disjunctive submission in the jury charge to be illegal. In *Ngo*, the defendant was charged with three separate offenses: (1) stealing a credit card; (2) receiving a credit card known to be stolen with the intent to use it; and (3) presenting a credit card to obtain a fraudulent benefit without the effective consent of the cardholder. 175 S.W.3d at 740; *see* TEX. PENAL CODE ANN. § 32.31(b)(1)(A), (b)(4) (Vernon Supp. 2007). The court held that when different offenses are charged, rather than merely alternate means of committing the same offense, the defendant is then denied a unanimous verdict. *See Ngo*, 175 S.W.3d at 743-45. In *Francis*, the defendant was charged with a single count of indecency with a child. 36 S.W.3d at 122. The State, however, introduced evidence of four different instances of indecency committed by the defendant, two involving touching the victim's breast and two involving touching the victim's genitals. *Id.* The jury charge instructed the jury to find the defendant guilty if he "engage[d] in sexual contact by touching the breast or genitals of [the victim]." *Id.* The court found that the jury charge impermissibly referred to two distinct criminal acts which were not properly charged in a single disjunctive application paragraph. *Id.* at 124.

The present case can be distinguished from both *Ngo* and *Francis* in that the jury charge at issue here merely referenced different means of Joseph's commission of the same offense—i.e., the murder of Gonzalez-Diaz by stabbing him with a knife. The difference in the two application paragraphs is the mens rea required; to find Joseph guilty under the first paragraph, the jury must have found that Joseph intended to kill Gonzalez-Diaz, whereas to find Joseph guilty under the second paragraph, the jury must have found

19

that Joseph intended to cause serious bodily injury and committed an act clearly dangerous to human life. Unanimity is not required on a specific mental state as long as the jury unanimously agrees that the state has proven the intent element beyond a reasonable doubt. *See Jefferson*, 189 S.W.3d at 311. Here, the jury did unanimously agree that the State had met that burden. We therefore conclude that the trial court did not err in its formulation of the jury charge. Accordingly, Joseph's fourth issue is overruled.

### III. Conclusion

Having overruled Joseph's four issues on appeal, we affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 10th day of July, 2008.

20